# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In Re:

Calvin1, LLC

Chapter 11 (subch. V)
Case No. 25-44582-mar

Debtor-In-Possession,

Hon. Mark A. Randon

_____/

### PLAN OF REORGANIZATION, AUGUST 11, 2025

THE DISTRIBUTION OF THIS PLAN IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE DEBTOR RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE INLINE DISCLOSURE STATEMENT, AND ALL ANCILLARY DOCUMENTS AT ANY TIME.

I.      The Debtor.

A.      Calvin1, LLC ("Debtor[1]") is a Michigan limited liability corporation. The Debtor incorporated in the state of Michigan, making it a "Domestic" Limited Liability Company. Debtor was formed by Ayad K. and Waleed Fadheel (Individually, "Wally," or, "Eddie," collectively, "Principals") on March 24, 2016[2]. Wally and Eddie are the only members of Debtor each holding 50 percent of the membership interest in Debtor. Wally and Eddie are serial entrepreneurs, owning multiple restaurants, restaurant "pop-ups," and real estate. In terms of the management of the Debtor's business, Eddie is responsible for behind the house management (taxes, books, etc.) and Wally manages the day-to-day operations.

Debtor is a franchisee of and was formed for the purpose of conducting business as a "Happy's Pizza" ("Happy's Corporate") franchisee. Debtor operated several Happy's Pizza_franchise locations throughout Michigan and Ohio, including Dayton Ohio. As of the Petition Date, Debtor's operation was reduced to one Happy's Pizza franchise location 2804 Salem Ave. Dayton, OH 45406. The contraction of Debtor's business was consistent with market trends in the restaurant industry, which experienced a seismic

---

1 All Capitalized terms shall be given their "parenthesized" meaning, all non-capitalized terms shall be presumed to otherwise be defined in accordance with "common usage."
2 See https://cofs.lara.state.mi.us/CorpWeb/CorpSearch and search for "Calvin1,LLC"

shift that began during the Covid 19 Pandemic. Services like "Doordash," have proliferated the industry, leaving sit-down and carry-out restaurants in the dust. In May 2025, Manav Raj of the Wharton School of Business, detailed[3] the profound effects of food delivery platforms on the US Restaurant industry and found that these programs have "altered industry structure" by increasing "margin pressure," and, "inter-firm competition." During the pandemic, this pressure ran wild and caused businesses to take drastic measures.

In 2022, market-pressures reached their apex, the pandemic stretched Debtor to its max, and after taking two rounds of Economic Impact Disaster Loans (EIDL) through the Small Business Administration of the United States of America ("SBA"), financial stresses caused the Debtor's insurance to lapse. During this time, a delivery driver, who Debtor strictly contends was "off-work," got into a car accident ("Incident"), tragically, killing Mr. Antonio Scott ("Decedent"). The Incident resulted in the Decedent, through his estate, filing a lawsuit, captioned Ladyna Rivera, As Administrator of the Estate of Antonio G. Scott Plaintiff, versus, Adrian Burrows, et al., case 2023-CV-05358, Montgomery County, Ohio, Court of Common Pleas (the "Lawsuit"). The Lawsuit was filed against the Debtor, the employee of the Debtor, a number of "John" or "Jane Does," and other parties, unrelated to the Debtor. The Debtor, through its principals, has vigorously maintained its defense, but, upon failing to achieve dismissal of the Lawsuit, the Debtor sought bankruptcy protection.

B.    The Principals.

1    Background.

Wally and Eddie continue to operate the Debtor and are equal members.

2.    Salary and fringes.

In exchange for their services to the estate, Wally and Eddie will continue to maintain annual salaries, paid through weekly payroll. Debtor pay Wally and Eddie in the amount of roughly $39,000.00 (each), per year, paid $750 per week.

---

3 Raj, Manav and Eggers, J. P., When Delivery Comes to Town: The Effect of Digital Distribution Platform Emergence on Industry Structure and Competition (March 12, 2025). Available at SSRN: https://ssrn.com/abstract=4051874 or http://dx.doi.org/10.2139/ssrn.4051874

3. Legal relationships with the debtor.

Other than their equity interests in and employment with the Debtor, neither Wally nor Eddie have a legal relationship to the Debtor.

C. The cause of the bankruptcy.

The bankruptcy was caused by a confluence of events. The events themselves include the downturn of the sit-down restaurant business which has impacted Debtor's restaurant operations, the proliferation of strained, increased wages, in conjunction with the Lawsuit (*Supra*). The Lawsuit itself, and the underlying incident occurred at a time when Debtor's liability insurance lapsed, and, thus, the Debtor was solely responsible to pay its own defense costs and is unable to mitigate the potential of any finding of liability and damages in connection with the Lawsuit. The legal costs that Debtor has incurred to defend the Lawsuit, along with the potential for enormous liability, north of three million dollars, precipitated Debtor's bankruptcy filing. The purpose of the bankruptcy filing is to restructure its current liabilities in order to remain in business while allowing Debtor the opportunity to repay its Debts based on its projected disposable income. Additionally, between full-and-part time workers, the successful reorganization of the Debtor will save the livelihoods of twenty-two employees.

III. Post-petition events of significance.

A. Transfers outside the ordinary course.

Debtor has not made any transfers outside the ordinary course of business, and ~~no~~has not conducted any asset sales which would otherwise contribute payments to the estate.

B. Summaries of cash collateral, post-petition financing, and adequate protection orders.

Debtor has two cash collateral creditors in the SBA and Happy's Corporate. At ECF No. 23, Debtor filed its request (in the form of a Motion) for authority to use "cash collateral." After brief negotiations and accommodation of reasonable requests of the EOUST, this Court, at ECF No. 51, rendered an Order authorizing use of cash collateral. In such Order, the Court made a finding that the Debtor had immediate need to use cash collateral in order to preserve going concern value and granted use of approximately

$285,000.00 with allowance of a 10-percent budget variance that the Debtor is authorized to use in its operation from the Petition Date through confirmation in this case.

C.      Litigation arising or continuing during the case, or which may be pending in any court.

The Lawsuit was pending prior to this matter being filed. However, the Lawsuit was administratively closed due to this bankruptcy case. The administrator of the Decedent's estate filed a claim on behalf of the Decedent at Claims Register 6 (the "Claim"). The Decedent's administrator did not attain a liquidated amount for the Claim. Thus, claims litigation or a request for a hearing to estimate the Claim may be required.

IV.     A.      Liquidation analysis: inline analysis.

B.      Risks, conditions, and assumptions regarding the stated values re: liquidation.

All risks, conditions, and assumptions are annotated into the liquidation analysis.

As shown, the all-asset liens of the SBA and Happy's Corporate, along with priority tax liabilities have otherwise resulted in "negative equity," meaning there would be no funds to distribute to general unsecured creditors in a hypothetical chapter 7 liquidation.

D.      Codebtors.

Debtor's obligations to the SBA and Happy's Corporate are personally guaranteed by both Wally and Eddie.

V.      Details regarding implementation of the plan.

A.      Summaries of Financial Information:

1.      Three years pre-petition.

For the three years pre-petition, Debtor had gross receipts, on average[4] of $1,082,954 per year. For the same period, Debtor's costs were $343,589.00, making Debtor profitable, on average, $739,365.00. In 2022 Debtor's operating costs and expenses were much lower than in 2023 and

---

[4] Considering 2022, 2023, and 2024

2024 - almost $100,000.00, less. This generally is attributable to a surge in the inflation of labor costs through the pandemic.[5]

To account for this higher cost in labor and other inputs, Debtor has consistently kept officer compensation under $30,000. Debtor is proposing to increase the salaries to $39,000, to account for the fact that the Principals proposed (*Infra*) service of the SBA debt will need to be offset.

2.     Post-petition.

Post-petition, Debtor has remained profitable, producing revenue of $194,621.77. Additionally, financial projections are attached inline, but, the Debtor's business does not vary all that much and can rely on the Cash Collateral budget post-confirmation, which may gain linear increase in income and expense, which doesn't vary much year-to-year, based upon historical analysis; and further, income analyses may be provided post-filing to show strength of financials, pre-confirmation in confirmation briefing. The Plan proposes to disburse all of Debtor's projected, disposable net of secured creditor and priority claims, to holders of non-priority general unsecured claims over a five-year period.

3.     Debtor will continue its business operations.

Debtor will continue to operate as a pizza restaurant and is seeking to enter into a new franchise agreement with Happy's Corporate. However, in the event that Debtor is unable to negotiate a new franchise agreement, Debtor will continue restaurant operations, albeit, without use of Happy's Pizza trademark and other Happy's Corporate intellectual property. Right now, negotiations have somewhat stalled, prior to filing this matter, a new agreement was to be offered, and was negotiated, to date, Happy's Corporate has not followed through with pre-petition negotiations. As stated at the 341 meeting, the Debtor is operating

---

5 National Restaurant Association: Elevated costs continue to pressure restaurant profitability (May 15, 2025). Available at SSRN: https://restaurant.org/research-and-media/research/restaurant-economic-insights/analysis-commentary/elevated-costs-continue-to-pressure-restaurant-profitability/

under the previously expired franchise agreement on a month-to-month basis as approved by Happy's Corporate.

To the extent no subsequent agreement is offered, there is a more than colorable possibility to continue operations because the franchise location can still be operated free and clear of the expired franchise agreement. The Debtor itself, through its Principals, has the opportunity to operate as a restaurant in any number of concepts and the Principals otherwise have many other restaurant businesses which the Debtor could pivot into.

VI.    Legal requirements:

A.    Voting procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the plan.  Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class.  Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and  should complete and sign each ballot separately.  A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court (September 4, 2025) for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order).  However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and inline disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted. A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.

B.    Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

C.    Confirmation

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1.    Each class of impaired creditors and interest must accept the plan, as described in paragraph VI.B., above.

2.    Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

D.    Modification

The debtor reserves the right to modify or withdraw the plan at any time before confirmation.

E.  Effect of confirmation

If the plan is confirmed by the Court:

1.  Its terms are binding on the debtor, all creditors, shareholders, and other parties in interest, regardless of whether they have accepted the plan.

2.  Except as provided in the plan:

    (a)  In the case of a <u>corporation</u> that is reorganizing and continuing business:

        (1)  All claims and interests will be discharged.

        (2)  Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

    (b)  In the case of a <u>corporation</u> that is liquidating and not continuing its business:

        (1)  Claims and interests will not be discharged.

        (2)  Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

    (c)  In the case of an individual or husband and wife:

        (1)  Claims will be discharged, except as provided in 11 U.S.C. " 523 and 727(a).  **Unless the court orders otherwise, the discharge will be entered after completion of plan payments as provided in ' 1141(d)(5)(a).  It is the usual practice of the court to close Chapter 11 cases after confirmation.  It is the responsibility of the individual debtor to file a motion to reopen the case for entry of discharge upon completion of plan payments.**

        (2)  Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. " 523 and 727(a).

See Part II-A of this Inline Disclosure Statement to determine which of the above paragraphs applies in this case.

[PAGE BREAK INTENTIONAL - END OF INLINE DISCLOSURE STATEMENT]
THE DISTRIBUTION OF THIS PLAN IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE DEBTOR RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE INLINE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.

## VII. PLAN TERMS.

A. Summary:

This plan of reorganization (the "Plan") is submitted by Debtor under Chapter 11 of Title 11 of the United States Code (the "Code") and proposes to pay its creditors from operational income.

This plan provides for the following classes of payment: (1) Administrative Expense Claims; (2) Special Tax; (3) Secured; (4) General Unsecured Claims; (5) post-confirmation executory contract claimants. The following disbursements for each class will be paid, only to the extent which they are deemed "allowed" by this Court (after claims litigation):

1. All administrative expense priority claimants, whose claims are not part of the claims allowance process (e.g., the Sub Chapter V. Trustee and Debtor's Counsel), and are filed and allowed post-confirmation, will be paid approximately one hundred cents on the dollar

2. All Special Tax Claims will be paid approximately one hundred cents on the dollar.

3. All Secured claims will be paid approximately one hundred cents on the dollar, through guarantors.

4. All General Unsecured Claims will be paid all projected disposable monthly income for the length of the plan.

5. Post-Confirmation Executory Contract creditors shall receive payment to the extent contained in post-confirmation executory contracts.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney. (If you do not have an attorney, you may wish to consult one.)**

B. GENERAL PROVISIONS.

NOTE: Terms defined in the in-line disclosure statement that are not re-defined below shall be given their defined meaning, *Supra*.

1.      DEFINED TERMS.

(a)      "Accepting Holder" means any Holder of a timely claim, filed prior to or on September 9, 2025, that also votes to accept the plan on a timely-returned ballot.

(b)      "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable date set forth in ECF No. 34 (or for which claim, under the express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the Debtor and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (i) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (ii) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim

unless and until such Entity pays in full the amount that it owes the Debtor. "Allow" and "Allowing" shall have correlative meanings.

(c)     "Ballot" means the ballot upon which a Holder of an Impaired Claim that is also entitled to vote, by virtue of filing a claim on or before September 15, 2025, shall cast its vote to accept or reject the Plan.

(d)     "Bankruptcy Code" means title 11 of the United States Code, 11 USC §§ 101-1523, as now in affect or as amended from time to time.

(e)     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over this matter, and, to the extent of the withdrawal of any reference under 28 USC § 157 and/or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

(f)     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or as amended from time to time.

(g)     RESERVED

(h)     "Cash" means legal tender of the United States of America or its equivalent.

(i)     "Cause(s) of Action" means, without limitation, any and all actions, causes, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date,

including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

(j)     "Case" means the matter before the Court, captioned above.

(k)     "Claim" means a claim, as defined in section 101(5) of the Code, that was timely under the Bar Order.

(l)     "Class" means a class of Claims, as described in Section C.

(m)     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Case.

(n)     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in this Case, within the meaning of Bankruptcy Rules 5003 and 9021.

(o)     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

(p)     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

(q)     "Disclosure Statement" means the inline disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the Debtor and which approval has been waived by provision of sub chapter V to chapter 11 of the Bankruptcy Code, as the same may be amended, supplemented, or otherwise modified.

(r)     "Disputed Claim" means any Claim that is not Allowed, or that is in violation of the Bar Order.

(s)     "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

(t)     "Distribution Date" means any date on which a Distribution is made.

(u)     "District Court" means the United States District Court for the Eastern District of Michigan.

(v)     RESERVED

(w)     RESERVED

(x)     "Effective Date" means the Business Day, as determined by the Debtor, on which each applicable condition contained in Section D1 has been satisfied or waived.

(y)     "Face Amount" means (a) if a proof of Claim has been Filed by the applicable Bar Date: (i) if only a liquidated amount is provided on the proof of Claim, the full stated amount claimed by the Holder in such proof of Claim, and (ii) if a portion of the Claim is stated as unliquidated, the liquidated amount, if any, claimed by the Holder in such proof of Claim; or (b) if a proof of Claim has not been Filed, the liquidated, undisputed, non-contingent amount, if any, set forth for a Claim in the List of Creditors.

(z)     "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, re-argument or rehearing has expired, and no

appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

(aa)    "Holder" means an Entity[6] holding a Claim.

(bb)    "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

(cc)    "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

(dd)    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

(ee)    "Non-Accepting Holder" means any Holder of an Allowed Claim who: (a) votes to reject the Plan or (b) fails to cast a valid Ballot to either accept or reject the Plan.

---

6 Entity is capitalized, but, defined as stated under section 101(15) of the Code

(ff)   "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

(gg)   "Secured Claim" means a Claim that is secured by a Lien on property in which the Debtor has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Debtor's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code, notwithstanding how a claim is filed, the Plan shall control as to what is or is not a Secured Claim.

(hh)   "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim as defined by the Code.

(ii)   "Voting Deadline" means the deadline fixed by the Bankruptcy Court for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

(jj)  "Voting Record Date" means the record date fixed by the Bankruptcy Court in the Disclosure Statement Order establishing the Holders of Claims entitled to vote to accept or reject the Plan.

2. RULES OF INTERPRETATION & COMPUTATION

(a) Rules of Interpretation.

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

(b) Computation of Time.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## C. CLASSIFICATION OF CLAIMS AND CRAMDOWN

### 1. General Terms.

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as that term is commonly understood under the code, for fees of counsel, trustee fees, and equity interests of Wally and Eddie, have not been classified and thus are excluded from the Classes described in Section(s) which follow.

A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class.

Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim. To date, attorney fees for Debtor's counsel through confirmation are estimated to be $30,000.00 and Subchapter V Trustee fees are estimated to be $7,500. As soon as practicable, after the effective date, Debtor shall disburse all administrative claim of the Debtor's bankruptcy counsel and the Subchapter V Trustee. All claims for Debtor's attorney's fees and Subchapter V Trustee fees will be paid by separate Order.

### 2. Administrative Claims in General - Class One.

Except as specified in this Section, Class One Claimants, unless otherwise agreed by the Holder of an Administrative Claim and the Debtor, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.

### 3. Separately Classified Claims

The following table designates Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan – all such classes are subject to some form of claims litigation, and therefore, all payment amounts, or funding amounts are unable to be presently calculated.

Debtor reserves the right to amend the classes, funding amounts, and any other aspect of this Plan or a portion thereof with respect to any aspect of treatment or payment of a Creditor. All allowed, and unimpaired classes shall receive 100% disbursement of whatever the Allowed amount is, post-claims litigation, and to the extent that claim remains one that is allowed after claims litigation.

| Class | Name | Claim Register # of Class members | Impaired |
|-------|------|-----------------------------------|----------|
| 2 | Priority Tax | 3 | NO/Not-Voting |
| 3 | Secured | 4 | NO/Not-Voting |
| 4 | General Unsecured Claims | 1, 2, 5, 6 | YES/Voting |
| 5 | post-confirmation executory contract claimants | Happy's Corporate | NO/Not-Voting |

Except with respect to 3005 claims which are later allowed by further stipulation or Order of the Bankruptcy Court; and, to the extent not otherwise Ordered by the Bankruptcy Court, the allowance, classification and treatment of Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor reserves the right to re-classify any Disputed Claim in accordance with any applicable contractual, legal, or equitable subordination. For the avoidance of doubt, this Section shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to bond policy claims against the Surety.

4. Class 2 – Priority Tax Class

This Class treats the Internal Revenue Service ("IRS") only. This claim will be paid in full, pursuant to the duly allowed claim at Claims Register 3 in the amount of $21,070.28. This claim is secured by UCC lien which is filed and perfected at a proper claims office in Michigan, effective against the Debtor by virtue of 26 USC § 6321& by virtue of 11 USC § 507(a)(5), warranting full payment of the entire claim over the life of the plan. Each month, a ratable one-sixtieth payment shall be taken from the Payment in Section G, 3, below, and remitted to the IRS.

5. Class 3 – Secured Class

The SBA will be paid in full directly by the Principals as guarantors who will continue to make all regularly scheduled payments on this indebtedness from their own income. The SBA claim is evidenced by the claim filed at Claims Register 4.

Under 11 USC § 1123(a)(4), this modification does not impermissibly impair the interest of the SBA because it will be paid in full according to the loan terms which, under 11 USC § 1124(1), leaves their interest, otherwise, unimpaired.

This payment is a contribution of equity to the Debtor by the Principals, and meant to detract from, or otherwise assuage concerns of, payments disclosed that were unintentionally made on "pre-petition indebtedness," and the like.

6. Class 4 – General Unsecured Claims

This class will receive all disposable income of the Debtor as that term is defined in Section 1191(d)(2) of the Code which is not otherwise devoted to the payment of necessary priority claims, over a period of 60 months after the effective date of the Plan.

In the event that the Plan is confirmed under 1191(d), the Debtor proposes to continue to make its own plan payments. To the extent this Court Orders, a ratable portion calculated by the Sub Chapter V Trustee shall be disbursed to each member of this Class pursuant to the terms of the Payment in section G, 3. To the extent the Court allows Debtor to make payment directly, they shall calculate payment in a manner the same as the Sub Chapter V Trustee would.

7. Class 5- Post-Confirmation Executory Contract Claimants

Happy's Corporate is in this class, they are a part of the operational budget, that has been ongoing on a month-to-month basis, to the extent a new franchise agreement is offered and executed, their claim shall be paid directly by the Debtor as a continued item of its operating budget; to Debtor's knowledge, no lien amount, or other form of claim exists between Debtor and Happy's Corporate.

To the extent any claim is later filed, but, prior to September 8, 2025, Debtor reserves the right to engage in claims litigation or the like. Unless Happy's Corporate offers a franchise agreement continuing the lien and/or security interest of Happy's Corporate, such security interest is discharged.

D. CONFIRMATION OF THE PLAN.

1. Conditions precedent to the Effective Date.

The Effective Date will not occur, and the Plan will not be consummated, unless and until Debtor has determined that all of the following conditions have been satisfied or waived:

(a) The Bankruptcy Court has entered the Confirmation Order in form and substance satisfactory to Debtor.

(b) The Bankruptcy Court has entered an order (which may be included in the Confirmation Order) approving and authorizing the Debtor to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

(c) The Confirmation Order shall not be stayed in any respect

(d) All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are

effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtor.

(e)     All authorizations, consents, and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked.

(I)     The conditions to the Effective Date set forth above may be waived in whole or part at any time by the Debtor in its sole and absolute discretion.

2. Voting procedures.

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are <u>not</u> entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and inline disclosure statement, each holder of such a claim or

interest should vote on the enclosed ballot either to accept or to reject the plan and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted. A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.

3. Acceptance.

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

4. Confirmation

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1. Each class of impaired creditors and interest must accept the plan, as described in paragraph VI.B., above.

2. Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

5. Modification

The debtor reserves the right to modify or withdraw the plan at any time before confirmation.

6. Effect of confirmation

If the plan is confirmed by the Court:

1.      Its terms are binding on the debtor, all creditors, shareholders, and other parties in interest, regardless of whether they have accepted the plan.

2.      Except as provided in the plan:

    (a)      In the case of a <u>corporation</u> that is reorganizing and continuing business:

        (1)      All claims and interests will be discharged.

        (2)      Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

    (b)      In the case of a <u>corporation</u> that is liquidating and not continuing its business:

        (1)      Claims and interests will not be discharged.

        (2)      Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

    (c)      In the case of an individual or husband and wife:

        (1)      Claims will be discharged, except as provided in 11 U.S.C. '' 523 and 727(a).  **Unless the court orders otherwise, the discharge will be entered after completion of plan payments as provided in ' 1141(d)(5)(a).  It is the usual practice of the court to close Chapter 11 cases after confirmation.  It is the responsibility of the individual debtor to file a motion to reopen the case for entry of discharge upon completion of plan payments.**

        (2)      Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. '' 523 and 727(a).

E. Effect of Nonoccurrence of Conditions to the Effective Date.

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with the sections above, then upon motion by the Debtor made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the

Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section: (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 1129 of the Bankruptcy Code, (b) and nothing contained in the Plan, nor any action taken or not taken by the Debtor with respect to the Plan, the inline Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the Debtor, (b) an admission of any sort by the Debtor or any other party in interest or (c) prejudicial in any manner the rights of the Debtor or any other party in interest.

G. MEANS FOR IMPLEMENTATION OF THE PLAN.

1. Funding of the Plan.

The reorganized debtor shall fund this plan from future earnings. The Debtor shall retain all assets of the bankruptcy estate, and such assets shall vest with the Reorganized Debtor, or as otherwise set out in the Plan regarding claims and/or Adversary Proceedings.

2. Vesting of Property.

Except to the extent otherwise provided in the Plan (specifically, regarding causes of action assigned to the litigation trust) or restricted by prior order of the Bankruptcy Court, on the Effective Date, all Cash and Assets of the Estate shall be transferred to and vest in the Liquidating Debtor free of any Claims, Liens and Equity Interests, to be managed and used for the sole purposes of achieving Consummation and carrying out the Plan and effectuating the Distributions provided for in the Plan. As of the Effective Date, all property of the Debtor shall be free and clear of all Claims and Equity Interests, except as otherwise specifically provided in the Plan. As of the Effective Date, all mortgages, deeds of trust, Liens, or security interests in any property of the Estate will be released and all the right, title and interest of any Holder of any such mortgages, deeds of trust, Liens or security interests shall be canceled, annulled, terminated and become null and void, except as otherwise specifically provided in the Plan. The Liquidating Debtor and Litigation

Trustee/Counsel for Debtor shall be authorized to act as attorney-in-fact for any such Holder to cause all public records to properly reflect and effectuate this provision. If the Confirmation Order is ever reversed or revoked, this provision of the Plan shall become null and void, and all Liens existing before the Confirmation Date shall be revived.

3. In order to carry out its duties under the Plan, the Debtor proposes to make ongoing, monthly disbursements to Creditors, however, in the event the Court Orders otherwise, the Sub Chapter V Trustee shall collect payment from the Debtor, in the amount of $4652 (the "Payment"), on the 15th of each consecutive month after the Effective Date, starting the first complete month after the Effective Date.

The Sub Chapter V Trustee shall make the same collection each month for sixty (60) months after the Effective Date, for disbursement to all claimants. All claimants shall receive share of the Payment in the amount delineated in the sections classifying each Claimant.

**END PLAN**

Respectfully submitted,

*Maxwell Dunn, PLC*

Dated: August 11, 2025

/s/ Alexander J. Berry-Santoro
Alexander J. Berry-Santoro (P81545)
*Attorney for Debtor-in-Possession*
2937 E. Grand Blvd., Ste. 308
Detroit, MI 48202
(248) 654-6344
aberrysantoro@maxwelldunnlaw.com

**LIQUIDATION ANALYSIS**
**COMPORTING WITH JUDGE RANDONS CHAPTER 11 CASE MANAGEMENT ORDER**
**ESTABLISHING DEADLINES AND PROCEDURES**

A. Items with sum-certain cash value are neither valued at market nor forced sale, but their true cash value as of the filing date. For example, bank funds have no "forced sale" value, they are what they are.

I.    Valuation of Assets and Amount(s) Secured Claims in Relation Thereto (as of May 12, 2025)

| Describe the Assets and Collateral | Creditor Holding Lien | Market Value and Forced Sale Value | Amount of Secured Claim | Equity | Comments |
|---|---|---|---|---|---|
| Cash On Hand | *[7] | $0.00 | * | NA | |
| Checking Accts. | * | $1,349.63 | * | NA | |
| Sordid food inventory | * | $7,700.00 | * | NA | |
| Office Fixtures (aggregate) | * | $41,923.63 | * | NA | See below for itemization |
| Office Equipment (aggregate) | * | $771,800.19 | * | NA | See below for itemization |
| Lease Interest Stock & Business Interest - Colasanti | * | $1.00 (M) | * | * | |
| Misc. Dishware | N/A | $2,000.00 | * | * | |

Total equity if fair market value used=   The collateral is all heavily used, and the fair market would likely be FS value.
Total equity if forced sale value used =   $62,236.98

II.    Proceeds of Assets (before deducting amount of secured claims)

|  | Estimated Liquidation Amount(s) |
|---|---|
| List each of the Asset types and Collateral as set forth in I. above using whichever of the values set forth is thought to be appropriate, and total same | $62,236.98 |

III.    Claims

---

7 All assets are subject to a lien of the SBA in the amount of $1,146,259.19, and the IRS in the amount of $12,141.53, and an indeterminate lien value for Happy's Corporate – there is no equity, therefore, in any property.

|                                                                    | Estimated Amount(s) |
|--------------------------------------------------------------------|---------------------|

(a)   Secured Claims

List separately and total                                              $1158400.72
(SBA $1,146,259.19, IRS $12,141.53)

(b)   Administrative Expenses

(List Separately and Total)

| | |
|---|---|
| RESERVED | $0.00 |
| Debtor's Attorneys[8] | $25,000.00 (includes pre-petition work) |
| Debtor's other professionals | by separate application |
| RESERVED | |
| RESERVED | |
| RESERVED | |
| Post-petition Accrued Payroll | paid per ECF 50/51 |
| Post-petition Taxes Payable | paid per ECF 50/51 |
| Sub Ch. V TT Fees[9] | $10,000.00 |

Total                                          $147,260.04

(c)   Pre-petition Unsecured Priority Claims

Priority Tax Claims Consisting of:

(List separately amounts owed to each
taxing authority and total)                            $8,928.75 (IRS)

(d)   Total Secured, Administrative and
Pre-petition Priority Claims                           $1,146,259.19

IV.   Distribution of Proceeds of Assets in the Event of Liquidation

(a)   Gross Proceeds Available from
Liquidation of Assets                                  $62,236.98

(b)   Less Total of

Secured Claims                           $0.00

Administrative Expenses                  $1158400.72

---

8 Professional fees are estimates
9 Professional fees are estimates and would vary depending on any work spent procuring consensual confirmation.

|  | Priority Claims[10] | $8,928.75 |
|---|---|---|

Pre-petition Unsecured[11]                                   $3,988,943.36

(c)     Net Proceeds

Proceeds Available to Pre-petition Unsecured
AFTER 100% payment
                                                                            $ 0.00

(d)     % Available to Pre-petition Unsecured Creditors        0.00 %

(e)     Proceeds Available for Equity Interests                $0.00

Based upon the Liquidation Analysis set forth above, the Debtor believes that a liquidation would result in a substantially smaller distribution to every class of its creditors than the proposed treatment set forth in the Plan.

**PLAN CALC:**

Monthly payment $4652.00 for 60 months: $279,120.00

On a monthly basis, payments breakdown as follows:

Debtor Counsel, est. claim  $25,000 (applied $20k retainer, $5k estimated post-filing fees), paid months 1-60 in the amount of $416.00 per mo, once this is paid, it will waterfall to other claimants in order of priority below.

Sub V Trustee, est. claim $10,000.00, paid months 1-60 in the amount of  $166.67 per mo.

IRS, allowed claim of $21,070.28, paid months 1-60 in the amount of $315.17 per mo.

General Unsecured Creditors in the amount of  $3,988,943.36 in the amount of $3754.00 per mo

Presuming income stays relatively static, and does not increase, nor do expenses, $225,249.60 will be paid to General Unsecured Creditors, a dividend of  roughly 6%, presuming no objection to claim occurs. Presuming claims objection ensues, the dividend could be increased by decreasing the claim at Claims Register 6.

---

10 Does not include professional fees
11 Includes claim 6 for reference, the amount of which is disputed, and the right to object to this claim is preserved

Itemization of office fixtures:

| | | |
|---|---|---|
| Dough Mixer (appx. 5 yrs old) $1,493.40 | Liquidation | $1,493.40 |
| Walk-in Cooler (appx 5 yrs old) | Liquidation | $11,556.00 |
| Walk-in Freezer (appx. 5 yrs old) | Liquidation | $12,842.00 |
| Two Door Freezer (appx 5 yrs old) | Liquidation | $1,949.00 |
| Double Deck Pizza Oven (appx. 5 yrs Old) | Liquidation | $1,399.00 |
| Three-foot char grill (appx. 5 yrs old) | Liquidation | $1,529.00 |
| Three 80-gallon fryers | Liquidation | $5,961.00 |
| 2 six-foot sandwich stations (5 yrs old appx) | Liquidation | $4,526.00 |
| 5 comp sinks (appx. 5 yrs old) | Liquidation | $1,494.95 |
| 2 handwash sinks (appx. 5 yrs old) | Liquidation | $666.68 |

Itemization of Office Equipment

| | | |
|---|---|---|
| 15 shelf units (appx. 5 yrs old) | Liquidation | $2,699.85 |
| Three prep tables (appx. 5 yrs old) | Liquidation | $547.47 |
| 1 smoker (appx 5 yrs old) | Liquidation | $874.00 |
| Range Burner (5 yrs old appx) | Liquidation | $2,299.00 |
| 3 POS systems (appx. 5 yrs old) | Liquidation | $600.00 |
| 5 tvs, approximately 4 years old | Liquidation | $750.00 |

# BUSINESS INCOME AND EXPENSES

FINANCIAL REVIEW OF THE DEBTOR'S BUSINESS (NOTE: This is a compilation of information contained in bank statements, and other historical financial data, it is presumed that historical income is the best judge of future income in the Debtor's business; these numbers are not created by counsel, and are merely being compiled for use of first day financials - more fulsome financials may be provided pre-final hearing on confirmation. Please seek a CPA for advice and/or counsel)

PER GAAMP, it is projected that growth and expense will grow linearly, each year, based on historical financial analysis.

PART A - AVERAGE MONTHLYGROSS BUSINESS INCOMEBASED ON Jan-Mar 2025:

   1. Average Monthly Gross Income For  Jan-Mar, 2025, Prior to Filing:      $      91,174.10

PART B - ESTIMATED FUTURE MONTHLY EXPENSE (These expenses are compiled based on the last two years of bank statement, averaged, and compared as against profit and loss from 21' through 23' taxes, expenses which are only tax deductible, e.g., depreciation and other deductions, are not included):

| | |
|---|---|
| Sales Taxes | $165.68 |
| Compensation of Officers (outside of payroll, Walleed is on payroll) | $1175.10 |
| Payroll - Employees | $31,488.81 |
| Repairs & Maintenance | $1621.10 |
| Rent | $2100 |
| Insurance General | $1554.34 |
| Processing Fees – Payroll | $627.08 |
| Alarm & Security | $92.95 |
| Software | $462.67 |
| Advertising(Part of AP pmt) | $4021.03 |
| Franchise Fees (part of AP pmt) | $1500 |
| Bank Charges | $736.75 |
| Credit Card Fees | $2237.88 |
| Supplies (e.g., food, soda, raw inventory) | $28570.16 |
| Fees - 3rd Party Commissions (e.g., tips) | $2447.08 |
| Pest Control | $43.08 |
| Postage & Shipping | $378.02 |
| Refuse Collection | $121.55 |
| Internet Expense | $704.69 |
| Utilities | $258.44 |
| Telephone | $833.50 |
| Laundry & cleaning | $271.02 |
| Driver Runs | $1221.41 |
| Legal & Accounting | $1100.22 |
| Licenses Fees, Permits | $351.85 |
| Taxes: FICA | $1421.86 |
| Taxes: Federal Unemployment | $484.78 |
| Taxes: State Unemployment | $332.54 |
| Auto expense | $ $604.60 |

22. Total Monthly Expenses (Add items 3-21)                                        $
    86,522.10

PART D - ESTIMATED AVERAGE NET MONTHLY INCOME:

23. AVERAGE NET MONTHLY INCOME (Subtract item 22 from item 2)                       $
    4652.00

24. SBA AP pmt. to be paid by insiders, SBA pmt. to be $546 through 7/27, then $5453.00